UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DAVID JUAREZ,

        Plaintiff,

                                    Case No. 19-cv-1593-pp

  v.

KENOSHA SHERIFF'S DEPARTMENT,
and KENOSHA COUNTY CITY JAIL OF THE
SHERIFF'S DEPARTMENT,

        Defendant.

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (DKT. NO. 16), DENYING PLAINTIFF'S REQUEST FOR PROTECTIVE ORDER (DKT. NO. 26), DENYING AS MOOT AND WITHOUT PREJUDICE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 31) AND REQUIRING PLAINTIFF TO FILE AN AMENDED COMPLAINT**

## I.    Introduction

The plaintiff, who is representing himself, filed a lawsuit against

defendants Kenosha Sheriff's Department and the Kenosha County City Jail of

the Sheriff's Department. Dkt. No. 1-2.[1] The complaint indicates that he is

suing for "personal injury" and violation of his Second, Sixth, Eighth and

Fourteenth Amendment rights. Dkt. No. 1-2 at 1. The plaintiff alleges false

imprisonment, kidnapping, neglect and cruel and unusual punishment. Id. He

---

[1] The complaint did not identify the city in which the plaintiff was living at the time he filed the complaint. The plaintiff attached to the complaint a document titled "Claim Against Kenosha County," dated October 3, 2019, on which he listed an address of 4000 Maryland Avenue, Apt. 125, 53405. Dkt. No. 1-2 at 14. That address is in Racine, Wisconsin. At the telephone hearing on October 7, 2020, the plaintiff informed the court that he had moved to Milwaukee.

1

seeks various forms of injunctive relief and compensatory damages of $12 million for "tortious physical psychological & emotional injuries resulting from neglect, false imprisonment, Kidnapping & Cruel [sic] and unusual punishment in compliance with state and federal civil law section 1983." Dkt. No. 1-2 at 13.

## II.    Facts

The plaintiff asserts that he made a call to Kenosha 911 dispatch on June 4, 2019 to make a report and to file for a restraining order on "an individual who verbally assaulted [him] threatening death." Dkt. 1-2 at ¶1. Dispatch said they would send an officer to his address (which, at the time, was in Kenosha). Id. at ¶2. When officers arrived, the plaintiff described to them attempts by his neighbor and his neighbor's son to antagonize him, resulting in one of the individuals asking the plaintiff if he wanted to die. Id. at ¶¶5-12. The plaintiff alleges that after he told the officers what had happened, he was instructed to put his hands behind his back so that he could be placed under arrest for disorderly conduct and bail jumping; he says he cooperated and was arrested without incident. Id. at ¶13.

The plaintiff was taken to the Kenosha County Jail in a van by the arresting officer, with whom the plaintiff was familiar. Id. at ¶14. While the plaintiff believes that the arresting officer over-dramatized his entrance to the jail, id. at ¶16, he says that booking took place without incident, id. at ¶17. He says that part of the booking process was a "medical/mental and physical Q&A." Id. The plaintiff then was dressed in a jail uniform, given a bed roll and escorted to the general population unit of the jail with some five to eight other

detainees. Id. at ¶18. Once in his assigned cell, the plaintiff went to bed, "anxious for court in the morning," id. at ¶19, but he was awakened at 12:00 am by an officer "screaming [his] last name . . . because [he] was going to have a conference," id. at ¶20. The plaintiff maintains that there was no conference, but that he was given another mental health evaluation to fill out, because the officer claimed he had no record of the previous assessment. Id. at ¶22-24.

The plaintiff's legal claims arise from the remainder of his stay at the county jail. He alleges that outside the conference room where he filled out the mental health evaluation, there were four to six additional officers; he says that they approached him the minute the conference officer instructed him to stand up, even though they had not been radioed to do so. Id. at ¶28. He alleges that two officers grabbed the plaintiff by each arm as he was being escorted down the hallway. Id. at ¶29. Out of fear and confusion, the plaintiff saw a yellow mop bucket in the path of travel, and decided to side kick the bucket, resulting in what he describes as a "minimal" amount of water spilling over the lip. Id. at ¶30. The plaintiff asserts that he was then "slammed" into a concrete wall by all of the four to six officers "without further aggression or resistance after the kick of the bucket." Id. at ¶31. He says that his head banged into the wall, that knees were on his skull and jawbone, that multiple bodies were on his back and that his hands and wrists were bound, bent and twisted. Id. The plaintiff contends that he was "suffocated and black [sic] out for long enuff where a puddle of [his] own saliva made [him] come to consciousness." Id. at ¶32. He

3

asserted that he stayed subdued on the concrete floor until medical personnel approached him and assessed him for injuries. Id. at ¶33.

The plaintiff says the officers then placed him in a restraint chair, "fastening every limb to its furthest capacity of tension;" he contends that they rolled him down the hallway "with the sergeant pointing a red laser beam connected to a stun gun aimed at [his] heart threatening to pull the trigger if [he] made a move already in restraints." Id. at ¶34. The plaintiff alleges that the officers put him in a small cell with an observation camera; he says the cell was "nothing but four walls of concrete a molded water drain with gnat flies flying all around [him]." Id. at ¶35. The plaintiff asserts that he was hyperventilating and losing blood circulation in his limbs, and being gagged and choked by the restraints; he says he started to sing in his head so that he didn't black out again and die by strangulation from the restraints. Id. at ¶36. He indicates that while he was going in and out of consciousness, a nurse observed him and demanded that the officers open the cell door so that she could adjust his restraints. Id. at ¶37.

The plaintiff explains that he stayed fully awake and alert until around 7:00 a.m. the next morning, still in the restraint chair despite no further incident or aggression. Id. at ¶38. When an officer approached his cell door to conduct first shift count, the plaintiff asked when he would be released from the chair and from segregation. Id. at ¶39. The officers responded that after breakfast was served to the units they would come and address the plaintiff's situation. Id. at ¶40. The plaintiff says that about an hour later, he was

4

released from the restraint chair, dressed in a tunic and put in a cell until he could have an evaluation with mental health. Id. at ¶41.

During the mental health evaluation, the plaintiff told the evaluator "the facts and tribulations of [his] experience of being detained falsely imprisoned and tortured by the Kenosha County Sheriff's Department." Id. at ¶42. The plaintiff explains that after the interview, he was returned to the segregation unit and "placed back in [his] systematically sectioned cell." Id. at ¶43. He asserts that about twenty minutes later, he was approached by "a woman corrections officer" and told to pack his things and that he "was being released per the District Attorney's Office denying prosecution." Id. at ¶44. A few minutes later, the cell door opened and two male corrections officers escorted the plaintiff to the intake division. Id. at ¶45. The plaintiff got dressed and was given his property back and directed to the exit. Id. at ¶46. Before leaving, the plaintiff went to the intake desk and asked if he could get a copy of his discharge papers; he says that a corrections officer denied his request, stating "what discharge papers they denied prosecution." Id. at ¶47. The plaintiff says he didn't want to get combative, so he left. Id.

The plaintiff says that because he wasn't a legal resident of Wisconsin at the time, he had no family or friends and so had to take an Uber home. Id. at ¶48. He says that after taking a shower and cleaning up, he "did a video confession on [his] YouTube Channel stating the details of [his] experience, adding up to the calculation of facts that register as kidnapping and torture on U.S. soil." Id. at ¶49. He then called the Kenosha "County City" Jail to make a

5

verbal complaint. Id. at ¶50. His calls later were returned and he was informed that he was speaking to the captain of the Kenosha County City Jail. Id. The plaintiff says that the person with whom he spoke "verbally did admit to some type of wrongdoing by corrections officers indicating 'some type of training mishap' without retribution." Id. at ¶51.

The plaintiff says that on September 6, 2019, "[o]n or about a 90 day grace period," he walked into the Kenosha County Sheriff's Department and demanded to speak "with a supervisor Lt./Kpt. Of the Kenosha County City Jail (Corrections Division)." Id. at ¶52. He says he was introduced to a lieutenant who took a verbal statement then "regarded" the plaintiff to the "Citizen's Complaint Against Department Personnel" form. Id. at ¶54. The plaintiff says that he "began to note the document with brief details stating the facts of [his] captivity and experience." Id. at ¶55. He says that when he had completed the form, it was witnessed and signed by the lieutenant, and the plaintiff asked for a photocopy for himself. Id. at ¶56.

Sometime around September 14, 2019, the plaintiff returned to the Kenosha County Sheriff's Department and demanded to speak "with a Superior of the Kenosha County Sheriff's Department (Officers Division)." Id. at ¶57. He says that a superior officer approached him and walked him out of the main lobby into an unoccupied area. Id. at ¶58. The plaintiff explains that he "expressed [his] distress an[d] informed [the superior] of an open investigation with the Kenosha County City Jail in cohesion connection to conspiracy to commit bias kidnapping and torture of a disabled person that's familiar guide

6

lines of the ADA civil rights act witch states law that prohibits discrimination against individuals with disabilities in all areas of public life." Id. The plaintiff informed the officer about what he believed to be an ongoing investigation into his complaint at the county jail. Id. at ¶58. While the next page of the complaint seems to have suffered from a printing error and is partially illegible, it appears that the plaintiff asserts that the superior officer directed him to the District Attorney's Office Id. at page 10. It also appears that the plaintiff alleges that in September 2019 he received a response letter dismissing his complaint. Id.

Sometime around September 26, 2019, the plaintiff received a response letter to his September 6 complaint. Id. at ¶66. The plaintiff asserts that the letter said, "in summary," that had he not acted out, there would have been other options for his safekeeping. Id. The letter—which the plaintiff asserts took roughly three weeks—also said that the plaintiff's claims were insufficient, denied any wrongdoing and dismissed the facts of his complaint. Id. at ¶67.

The plaintiff says that in the summary section of the answer to his complaint, the Kenosha County Sheriff's Department stated, "The following chronology was established: you were arrested and brought into the secure area of the jail at approximately 8:45 p.m. on the date of 5/5/19." Id. at ¶69. The plaintiff asserts that the summary section also stated that May 6, 2019 was the date of his "assault with corrections officers and placed into a restraint chair." Id. at ¶70. The plaintiff says that he couldn't "register" the dates, so he went to his "documents of efiles" and found that he was discharged from the

7

jail on May 5, 2019 at 10:00 a.m., not arrested that day; he says this "indicated possibilities of tampered documents." Id. at ¶71.

The plaintiff says that around September 14, 2019, he also reached out to the Kenosha County District Attorney's office telephone number and spoke with a representative "about [his] case log." Id. at ¶73. The person with whom the plaintiff spoke told him that he was "arrested June of no date and was charged with misdemeanor bail jumping confirming no other charges pending then leading to denial of prosecution." Id. at ¶74. The plaintiff responded that he didn't understand "her information on the grounds of bail jumping needing to be connected to a crime for it to be valid as a charge." Id. at ¶75. The plaintiff says the representative agreed and put him on hold "to further look into [his] assessment of information." Id. The plaintiff says that the representative then informed him that she had directed his concerns to a district attorney investigator named Bryan and that she took his number for a follow-up, but that his call never was returned. Id. at ¶76.

## III.    Procedural History

On October 4, 2019, the plaintiff filed his complaint in Kenosha County Circuit Court. Dkt. No. 1-2. The defendants filed their answer in the state court case on October 30, 2019, dkt. no. 1-3, and removed the case to federal court that same day, dkt. no. 1. On November 19, 2019, this court ordered the parties to file proposed Rule 26(f) plans. Dkt. No. 8. The plaintiff filed his plan

8

on December 4, 2019, dkt. no. 9,[2] and the defendants filed theirs on December 9, 2019, dkt. no. 10; only the defendants' plan laid out a discovery schedule, and the defendants indicated that they had not been able to reach the plaintiff to confer on a joint plan. The court entered a scheduling order on January 30, 2020. Dkt. No. 12.

On May 13, 2020—five months before discovery was to close and six months before the deadline the court had set—the plaintiff filed a motion for summary judgment. Dkt. No. 14. The court denied the motion as premature. Dkt. No. 15. A few days later, on June 17, 2020, the defendants filed the current motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which the court may grant relief. Dkt. No. 16. Although the plaintiff filed an affidavit in response, the affidavit does not address the substance of the motion. Dkt. No. 20. The plaintiff also filed with the court interrogatories and requests for production. Dkt. No. 21.

At that point, the defendants asked the court to modify the scheduling order, asking the court to rule on the pending motion to dismiss first and then set new dates, if necessary. Dkt. No. 22. The court granted that request and struck the scheduling order, indicating that if necessary, the parties should be

---

[2] On this document, the plaintiff listed his residence as 4000 Maryland Avenue in Racine—the same address he'd listed on the complaint. Dkt. No. 9 at 3. He continued to reflect this address on his filings with the court until September 30, 2020, when he called the clerk of court's office and reported that he would be using P.O. Box 1301, Racine, Wisconsin 53401 as his mailing address until he could establish his new residence. The clerk's office explained to the plaintiff that he would need to advise the court in writing of his new address once he had it.

prepared to discuss scheduling at the hearing the court had scheduled for
October 7, 2020 for the purpose of ruling on the motion to dismiss. Dkt. No.
24.

The court entered the order striking the discovery and motions schedule
on July 20, 2020. Dkt. No. 24. Four days later, the court received from the
plaintiff a response to the defendants' motion to strike the scheduling order,
dkt. no. 25, a request for what the plaintiff called a "protective" order, dkt. no.
26, and an affidavit asking the court to decline the defendants' request to
strike the scheduling order, dkt. no. 27. Three days after *that*, the court
received from the plaintiff an objection to the court's order striking the
scheduling order, dkt. no. 28, and an affidavit to reassess indigency, dkt. no.
29. And two weeks after the court struck the scheduling order, the court
received a document titled "Plaintiffs Representation to Courts Under Chapter
805.04 Stipulation of Voluntary Dismissal and Chapter 804.12 Failure to Make
Discovery; Sanctions Under Rule 37(e)(2) FER With Demand to Stop Deposition
and Grant Relief," dkt. no. 30.

On August 18, 2020, the defendants filed a motion for summary
judgment on the plaintiff's state law claims. Dkt. No. 31. The plaintiff has not
responded to that motion. The defendants also responded to the plaintiff's
"representation to courts," explaining that they'd not been able to obtain any
information from the plaintiff through discovery that shed light on his claims,
that they had suffered a cyber attack on July 23, 2020 that shut down their
computer systems and that they had left a message for the plaintiff explaining

10

that. Id. The defendants argued that if the plaintiff's "representation" was meant to be a motion to compel, the court should deny it because the plaintiff had refused to meet and confer in good faith, and because the plaintiff filed his motion *after* the defendants had responded to discovery. Id. at 4-5.

## IV.  Defendant's Motion to Dismiss (Dkt. No. 16)

### A.  Legal Standard

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); Gibson v. City of Chi., 910 F.2d 1510, 1520 (7th Cir. 1990). When evaluating a motion to dismiss under Rule 12(b)(6), the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. AnchorBank, FSB v. Hofer, 649 F.3d 610, 614 (7th Cir. 2011). To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In this context, "plausible," as opposed to "merely conceivable or speculative," means that the plaintiff must include "enough details about the subject-matter of the case to present a story that holds together." Carlson v. CSX Transp., Inc., 758 F.3d 819, 826-27 (7th Cir. 2014) (quoting Swanson v. Citibank, N.A., 614 F.3d 400, 404-05 (7th Cir. 2010)). "[T]he proper question to ask is still

11

could these things have happened, not did they happen." Id. at 827 (internal quotation and citation omitted). The plaintiff "need not 'show' anything to survive a motion under Rule 12(b)(6)—he need only allege." Brown v. Budz, 398 F.3d 904, 914 (7th Cir. 2005).

To state a claim of violation of his civil rights under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan-Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court construes liberally complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. (Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.    Discussion

The defendants assert in their motion to dismiss that they are not the proper defendants for the plaintiff's claims and that the plaintiff has not stated a claim for which a federal court may grant relief. Dkt. No. 17 at 1. The defendants first argue that they—the sheriff's department and the jail—are not "suable entities." Id. at 3. Next, they argue that the plaintiff has not stated facts that would allow him to assert a claim against any municipal entity. Id. at 4-5.

The plaintiff named as defendants the Kenosha Sheriff's Department and the Kenosha County City Jail of the Sheriff's Department. Section 1983 allows

12

a plaintiff to sue a "person" who violates his constitutional rights under color of state law. Neither a sheriff's department nor a jail is a "person." The United States Supreme Court has held that there are some circumstances in which municipalities or local government units can be considered "persons" and sued under §1983. Monell v. Dept. of Soc. Servs. Of City of New York, 436 U.S. 658 (1978). But neither a sheriff's department nor a jail are municipalities or local government units.

Federal Rule of Civil Procedure 17(b) states that defendants in a federal lawsuit must have the legal capacity to be sued. State law determines an entity's capacity to be sued. Webb v. Franklin Cty. Jail, No. 16-cv-1284-NJR, 2017 WL 914736, at *2 (S.D. Ill. Mar. 8, 2017). Under Wisconsin law, the Kenosha County Sheriff's Department "is not a legal entity separable from the county government which it serves," and is therefore not subject to suit under §1983. Whiting v. Marathon Cty. Sheriff's Dept., 382 F.3d 700, 704 (7th Cir. 2004). Nor is a jail a separate, suable legal entity. See Smith v. Knox Cty. Jail, 666 F.3d 1037, 1040 (7th Cir. 2012).

Perhaps the plaintiff intended to sue whatever entity employs the people at the sheriff's department and the jail whom he alleges violated his constitutional rights. But §1983 "creates a cause of action based on personal liability and predicated upon fault; thus liability does not attach unless the individual defendant caused or participated in a constitutional violation." Hildebrant v. Ill. Dep't of Nat. Resources, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting Vance v. Peters, 97 F.3d 987, 991 (7th Cir. 1996)). Because §1983

13

makes public employees liable "for their own misdeeds but not for anyone else's," <u>Burks v. Raemisch</u>, 555 F.3d 592, 596 (7th Cir. 2009), a plaintiff cannot sue the employer of the people whom he believes violated his rights; he must specifically allege what each individual defendant did (or did not do) to violate his constitutional rights in order to state a claim.

At the October 7, 2020 hearing on the motion to dismiss, the plaintiff told the court that he does not know the names of the officers whom he believes violated his rights. The court notes that the plaintiff claimed in the complaint that he was very familiar with the officer who arrested him. Dkt. No. 1-2 at ¶14. If he knows the name of that officer/sheriff's deputy, and if he believes that officer/sheriff's deputy violated his rights by wrongfully arresting him, he should be able to name that officer. It is not uncommon for plaintiffs not to know the names of law enforcement officials whom they claim violated their civil rights. In those circumstances, plaintiffs may sue "John Doe" or "Jane Doe" defendants using those placeholders and describing the individuals. For example, the plaintiff might sue John Doe defendants #1-6 who were on duty in the general population unit of the Kenosha County Jail on June 5, 2019 between midnight and 3:00 a.m. He may be able to provide more detail—he may know that there were three corrections officers, a sergeant and a lieutenant, or he may know that two of the officers were women and four were men, or he may know that four officers were Black and two were White. He can use whatever information he has about the John/Jane Doe defendants to

identify them. Then he may use discovery to ask for the names of the individuals whom he has described in the complaint.

The plaintiff told the court at the October 7, 2020 hearing that he wanted to name the individual defendants whom he believed violated his constitutional rights. If the plaintiff also meant to state a claim against Kenosha County itself, he has not stated sufficient facts to support such a claim. A county may be held liable under §1983 only where the plaintiff alleges that "his injury was the result of the [county's] official policy or custom." Rice v. Correctional Medical Servs., 675 F.3d 650, 675 (7th Cir. 2012). See also, Monell, 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury that the government as an entity is responsible under § 1983."). For the plaintiff to state a claim against Kenosha County, he must allege facts showing that the county had a policy, custom or practice that resulted in the alleged violations of his constitutional rights. The plaintiff has not done so.

Because the plaintiff has sued defendants who are not subject to suit under §1983, the court must dismiss the complaint against those defendants.

As is required by the Seventh Circuit, however, the court will give the plaintiff an opportunity to amend the complaint. Runnion *ex rel.* Runnion v. Girl Scouts of Greater Chi. and Nw. Ind., 786 F.3d 510, 519-20 (7th Cir. 2015) ("Unless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to

15

amend after granting a motion to dismiss."). Along with this order, the court is sending the plaintiff a blank copy of the court's complaint form; he must use this form to draft his amended complaint. He must write the word "Amended" on the first page at the top, in front of the word "Complaint." He must put the case number assigned to this case—19-cv-1593—in the space provided for the case number. He must list in the caption the name of every individual whom he believes violated his constitutional rights and must use "John Doe" or "Jane Doe" placeholders if he does not know the names of defendants. If he names more than one John or Jane Doe, he must distinguish between them, either by using numbers ("John Doe #1) or descriptors ("John Doe corrections officer" or "Jane Doe lieutenant"). He must explain in the body of the complaint what each defendant did to violate his constitutional rights. He does not need to use legal language or cite cases. He needs only to explain who did what to him, when and where they did it and, if he knows, why they did it.

The court also notes that the plaintiff alleged in the complaint that the defendants violated his rights under the Second, Sixth, Eight and Fourteenth Amendments to the Constitution. Dkt. No. 1-2 at 1. The Second Amendment state that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." None of the facts alleged in the plaintiff's complaint implicate the Second Amendment. The Sixth Amendment gives rights to individuals who are prosecuted for a crime—the right to a speedy and public trial by an impartial jury, the right to confront witnesses against him, the right to compulsory

16

process and the right to defense counsel. But the plaintiff alleges that he was not charged with a crime and was not prosecuted, so the facts the plaintiff alleged in the complaint do not implicate the Sixth Amendment.

The facts that the plaintiff alleged in his complaint sound like claims of false arrest (which sounds in the Fourth Amendment right to be free from seizure without probable cause, see Patrick v. City of Chi., No. 18-2759, 2020 WL 5362160, at *8 (7th Cir. Sept. 8, 2020)), unlawful detention (which also sounds in the Fourth Amendment, see Manuel v. City of Joliet, Ill., 903 F.3d 667 (7th Cir. 2018) and excessive force (which, for a pretrial detainee, sounds under the due process clause of the Fourteenth Amendment, which "protects a pretrial detainee from the use of excessive force that amounts to punishment," Kingsley v. Hendrickson, 576 U.S. 389, 39-98 (2015) (quoting Graham v. Connor, 490 U.S. 386, 395 n.10 (1989)). The court is not holding at this point that the plaintiff can state claims under the Fourth or Fourteenth Amendments—it will not be able to determine that until it sees the amended complaint. The court notes only that the facts the plaintiff alleged in his original complaint implicate only these two constitutional amendments, not the Second or the Sixth.

Finally, the court notes that the plaintiff mentioned more than once in his complaint (as well as in his affidavit to reassess indigency) that he is disabled. He also mentioned the ADA, the Americans with Disabilities Act. The court assumes that because he did not directly allege that any officer did anything to him on the basis of his disability, the plaintiff did not intend to file

17

a claim for violation of the ADA. If the plaintiff *did* intend to assert such a claim, he must provide information in the amended complaint about why he believes a particular defendant discriminated against him based on his disabilities.

**V.    Defendants Motion for Summary Judgment (Dkt. No. 31)**

Under Fed. R. Civ. P. 56, a party may move for judgment in its favor if there is no genuine dispute as to any material fact and the party is entitled to judgment under the law. The defendants have filed for summary judgment on the plaintiff's state law claims—kidnapping and neglect—because they allege that the plaintiff has not complied with Wis. Stat §893.80, the statute that governs suits against governmental agencies of Wisconsin in their official capacities. Dkt. No. 32 at 3-4. They allege that the plaintiff did not provide notice within 120 days of the incident as required by the statute, did not serve a written claim on the municipality containing his address and an itemized statement of relief and did not give the municipality the opportunity to evaluate his claim. Thus, they argue that they are entitled to judgment in their favor regardless of the merits of the plaintiff's claims.

The defendants concede that on October 3, 2019, the plaintiff filed in the state court a document titled "Notice Under § 893.80 for Wisconsin Municipalities;" that document is located at Dkt. No. 1-2 at 15. They point out that the complaint alleges two different dates for the events about which the plaintiff complains—at the beginning of the complaint, the plaintiff asserts that he was arrested on *June* 4, 2019 and that the events at the jail took place on

18

*June* 4 and 5; toward the end of the complaint, when the plaintiff is discussing his communications with the sheriff's department and the D.A.'s office, the plaintiff says that he was released from the jail on *May* 5, 2017. The defendants argue that if the events of which the plaintiff complains took place on May 5, then his October 3, 2019 notice was filed over 150 days later—too late under the statute. They also argue that the notice is deficient because it was not served on the municipality, does not include his address and does not state an amount of damages sought.

The court need not decide whether the plaintiff's October 3, 2019 notice complied with the statute. The court has dismissed the plaintiff's federal claims. This federal court may exercise jurisdiction over state-law claims only if those state-law claims are related to federal claims pending before the court. See 28 U.S.C. §1367. Because there are no valid federal claims pending before the court, the court cannot exercise supplemental jurisdiction over any state-law claims. The court will dismiss the defendants' motion for summary judgment as moot, without prejudice.

The court observes that there may be other issues with the plaintiff's state-law claims. The plaintiff alleges repeatedly throughout the complaint that he was "kidnapped." In Wisconsin, kidnapping is a *criminal* offense. Wis. Stat. §940.31. Only the government—the District Attorney's Office—can bring a criminal charge for kidnapping; a citizen has no private right to bring a civil action for kidnapping. The plaintiff indicates that he has reported the events he describes to the District Attorney's Office. If the plaintiff includes an allegation

19

of kidnapping in his amended complaint, this court will not allow him to proceed on that claim.

## VI. Discovery Issues

The court has stricken the scheduling order it issued prior to the defendants filing their motion to dismiss. Dkt. No. 24. The court should have included in that order a requirement that the parties stay all discovery until the court had the opportunity to rule on the motion to dismiss. At the end of this decision, the court will order the parties to stay all discovery until the defendant files his amended complaint and the court has an opportunity to review it. If the amended complaint states claims for which a federal court may grant relief, the court will issue a new scheduling order.

The court notes several things, however. At the October 7, 2020 hearing, the court observed that in June of this year, the plaintiff had filed his interrogatories and requests for production of documents with *the court.* The court stated at the hearing, and reiterates here, that parties must exchange their discovery with each other. They must not file their discovery requests with the court. The court does not receive discovery or participate in the discovery process; that process takes place between the parties.

Next, the court observes what the defendants have observed—that the dismissed complaint lists two different dates for the events about which the plaintiff complains. Part of the complaint says the events took place on June 4-5, 2017, while the other part seems to say that the events took place on May 4-5, 2017. If the plaintiff files an amended complaint, he must clarify the dates

20

on which the events he describes took place. If the court allows the plaintiff to proceed with this lawsuit, he will not be able to obtain the names of the officers involved in those events if he does not provide the correct dates on which the events occurred.

In his "representation to the courts," the plaintiff alleged that on June 26, 2020, he filed his interrogatories and requests for admission, with responses due in thirty days. Dkt. No. 30. He said that on the morning of July 27, he got a call from defense counsel, returning his call; defense counsel indicated that she had the discovery ready but that her computer system had been down for some days and she asked the plaintiff for an extension of time to provide him with the discovery. Id. at 1. The plaintiff said he declined that request. Id. at 2. He says that defendant counsel responded that she would file a request for a stay that the court would grant; the plaintiff alleged that he had an urge to claim this as fraud but out of respect to the court, decided not to do so. Id. He asserted that defense counsel called him back a few minutes later, telling him that he had an obligation to work with her before involving the court. Id. The plaintiff asserted that under the law, if a party claims computer mishaps the party is obligated to show documentation of the repair or maintenance "as well as the defendant's right to file a Rule 29(b) in regards to there issue." Id. He discussed spoliation. Id. at 2-3. He cited the Wisconsin rules governing discovery (although this case now is in federal court and not subject to the Wisconsin discovery rules). Id. at 3. The plaintiff claims that he recorded the second phone call with defense counsel, in which he claims she

lied about calling and leaving him a message (he says his phone was disconnected) and said he would provide the court with the recording. Id. The plaintiff did not ask the court to take any specific action.

Concerned that the plaintiff intended this motion to be a request for sanctions relating to discovery, the defendants filed a responsive brief. Dkt. No. 36. The defendants explained that on July 23, 2020, they had been subject to a cyber attack that shut down their computer systems and caused them to be inaccessible for several days; the phone and email came up first on July 27, 2020 and the file document system was restored a day or two later. Id. at 36. Counsel stated that on July 24, 2020, she called the plaintiff at the number the firm had on file for him and left a message indicating that she needed more time to provide the discovery; she notes the plaintiff's claim that he did not receive this message because that phone number was disconnected. Id. Counsel confirms the July 27, 2020 phone conversation with the plaintiff in which she asked for more time; she indicated that she needed more time because of the cyber attack, because she needed to obtain and evaluate the documents being requested and because she had concerns about releasing some documents without a protective order (including a jail video that could implicate safety and security concerns). Id. at 3-4. She confirms that the plaintiff denied the request for additional time, and says that the defendants since have provided some discovery, along with objections and an explanation that the defendants are trying to obtain and evaluate video and/or 911 dispatch tapes to decide whether to redact or obtain a protective order. Id. at 4.

22

The court will not treat the plaintiff's "representation to the courts" as a motion to compel or a motion for sanctions. For one thing, the plaintiff did not ask the court to do anything. Nor did the document comply with Civil Local Rule 37, which requires the parties to meet and confer (and to certify that meeting and conference in writing) before filing a motion to compel. And as the court explained to the plaintiff during the October 7, 2020 hearing, not only is it not fraudulent or inappropriate for a party to try to work out an extension of a discovery deadline with the other side before involving the court—it is preferred.

The plaintiff asserted in his filing and at the October 7 hearing that the "law" requires a party who claims to be unable to comply with discovery demands because of computer problems to provide proof, such as a maintenance receipt. If there is such a "law," this court is unaware of it. The plaintiff cited Rule 29. Fed. R. Civ. P. 29 allows parties to agree to deposition conditions and to modify any other procedures governing or limiting discovery without court approval, unless the agreement "would . . . interfere with the time set for completing discovery, for hearing a motion, or for trial." This rule says nothing about requiring proof of computer malfunction. Indeed, this rule says exactly what the court told the plaintiff at the October 7 hearing—that the parties should try to work out between themselves extensions of discovery deadlines. In this case, the deadline for completing all discovery had been stricken, so there was no discovery deadline with which to interfere, nor was

23

there a trial date. Defense counsel's attempt to work out an extension with the plaintiff was appropriate and allowed by Rule 29.

The plaintiff also alleges that the defendants told him they had no video, but that now they are saying that they have video. The documents before the court indicate that the defendants were in the process of trying to determine whether there was a video and then review whatever video there was to determine whether they would need to ask for a protective order. In federal court, a "protective order" is an order the court issues that allows the parties to exchange discovery on the condition that they don't share that discovery with anyone else. A protective order allows the parties to exchange sensitive documents and information without being concerned that that information will get out to people who are not parties to the lawsuit. The court issues protective orders in civil cases all the time; they are routine.

The court will not require the defendants to provide any proof of the cyber attack. The court will not impose any sanctions on the defendants. If the plaintiff files an amended complaint that states a claim and the case goes forward, the court will set a new discovery schedule, and it expects that the parties will interact with each other cordially and cooperatively, and that they will try to resolve any disagreements about discovery with each other before involving the court.

## VII.    Plaintiff's Proposed Request of a Protective Order (Dkt. No. 26)

The plaintiff also filed a document titled "Pro-Se Litigant David Juarez Proposed Request of a Protection Order." Dkt. No. 26. The document asks for a

24

protection order against the Kenosha County Sheriff's Department and the Kenosha County Jail Sheriff's Division. Id. at 1. It states that the plaintiff filed a verified complaint against police officers and sheriff's in *Racine*, Wisconsin sometime around July 14, 2020. Id. he says that the allegations against the Racine officers and sheriffs "took place 5 months 'before' the current kidnapping and torcher presented in this original case file document." Id. The plaintiff describes a number of events that took place in Racine, including arrests and stops (which the plaintiff claims were unlawful), a mechanic referred to the plaintiff by the police holding his car for five days and not repairing it correctly, Racine officers coming to his home for no reason, his receipt of death threats and hate crimes, his eviction from his apartment, people giving his dog rotting food, hate mail notes, mail tampering and threats and harassment. Id. at 2-3. The plaintiff says that as a result of all this, he has declined to participate in any further court proceedings in Racine. Id. at 3. He asked this court "to grant the request of an order of protection against the defendants claiming intimidation or threats of a witness with the above facts and if allowed the Racine county sheriff's department, the Racine county city police departments, Racine district attorneys, Racine board of commission and the Racine public defendants office." Id. at 4.

The court will deny this motion. The motion makes no allegations against the defendants in *this* case—the Kenosha County Sheriff's Department and the Kenosha County Jail. The plaintiff has not filed a lawsuit in this federal court against any of the Racine entities he describes in the motion. There is nothing

the court can do for the plaintiff in this case with regard to the issues he had in Racine.

## VIII. Indigency Status

One of the documents the plaintiff has filed is an affidavit to reassess indigency. Dkt. No. 29. During the October 7, 2020 hearing, the court told the plaintiff that he had never asked this court to assess his indigency status, and that if he wanted this court to find him indigent, he would need to file a request with this court.

After the hearing, the court reviewed the plaintiff's affidavit again. The plaintiff says that he receives SSI benefits for his disabilities, but that the state court required him to pay the fee anyway. Dkt. No. 29. He asks the court to "reevaluate his right to claim indigent and grant the reimbursement of his filing fees in the amount of $310.55." Id. It appears that the plaintiff is asking this federal court to reimburse him the $310.55 filing fee he paid to the *Kenosha County Circuit Court* for filing the complaint there. This federal court cannot grant that request. Only the Kenosha County Circuit Court can decide whether to reimburse the filing fee the plaintiff paid to that court. The court can only suggest that the plaintiff contact the clerk's office for the Kenosha County Circuit Court and explain his circumstances, and ask whether they will consider reimbursing the fee he paid.

The plaintiff paid that fee for the privilege of filing a case in the Kenosha County Circuit Court. He has not paid, and is not required to pay, *any* filing fee in the federal court. It was the defendants' decision to remove the case from

state court to federal court, so the defendants paid the $400 civil filing fee to remove the case here. So, while the court told the plaintiff during the October 7, 2020 hearing that it would send him a form asking for indigency status, the court has not included such a form with this order, because it turns out the plaintiff does not owe a filing fee here.

## IX.    Addresses

Finally, the court notes that at the October 7, 2020 hearing, the plaintiff informed the court that he had moved to an address in Milwaukee. The court advises the plaintiff that if this lawsuit continues, it is the *plaintiff's* obligation to promptly notify the court of any change of address. If the plaintiff does not keep the court up to date on his address, neither the defendants nor the court can communicate with him. The court has been forced to dismiss lawsuits in the past because plaintiffs did not let the court know when they moved.

## X.    Conclusion

The court **GRANTS WITHOUT PREJUDICE** the defendants' motion to dismiss. Dkt. No. 16.

The court **ORDERS** that the plaintiff must file an amended complaint that complies with this order in time for the court to receive it by the end of the day on **October 30, 2020**. If the court does not receive an amended complaint from the plaintiff by the end of the day on October 30, 2020, the court will dismiss the case without further notice or hearing on the next business day. If the plaintiff timely files an amended complaint, the court will review it.

The court **DENIES** the plaintiff's Proposed Request of a Protection Order. Dkt. No. 26.

The court **DENIES AS MOOT AND WITHOUT PREJUDICE** the defendant's motion for summary judgment. Dkt. No. 31.

The court **ORDERS** that all discovery is **STAYED** until further order of the court.

Dated in Milwaukee, Wisconsin this 8th day of October, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

28